1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

10

11

12

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL R. ISAKSON, et al.,

Defendants.

CASE NO. C14-5630 BHS

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT

13

14

15

16

This matter comes before the Court on the United States of America's motion for

summary judgment (Dkt. 31). The Court has considered the pleadings filed in support of

and in opposition to the motion and the remainder of the file and hereby denies the

motion for the reasons stated herein.

17

**I. PROCEDURAL HISTORY**

18

19

20

21

On August 8, 2014, the Government filed a complaint against Defendants Heritage

Chiropractic Clinic, Joy L. Isakson, Michael R. Isakson, JP Morgan Chase Co., Pierce

County, and J & M Charitable Foundation to foreclose federal tax liens on two properties.

Dkt. 1.

22

1    On September 2, 2015, the government filed a motion for summary judgment

2  against Michael and Joy Isakson ("Isaksons") and J&M Charitable Foundation ("J&M")

3  (collectively "Defendants").  Dkt. 31.  On September 21, 2015, Defendants responded.

4  Dkt. 32.  On September 25, 2015, the government replied.  Dkt. 33.

5                           **II. FACTUAL BACKGROUND**

6    Michael and Joy Isakson married in 1976.  Dkt. 31, Exh. 1, Michael Isakson

7  Deposition ("MI Dep.") at 26:25.  Michael has worked as a licensed electrician since

8  1977 and is the couple's primary source of income.  *Id*. at 42:14-16.  The Isaksons have

9  three adult children: Michael Jr., Jeffrey, and Michelle.  *Id*. at 89:1-8.  The Isaksons have

10  also raised another child, D.M, since the age of four even though they do not have legal

11  custody of him.  *Id*. at 58:18-59:17.

12    On November 15, 1977, the Isaksons acquired a parcel of real property located at

13  3725 South K Street, Tacoma, Washington (the "Tacoma Property") via a Statutory

14  Warranty Deed. Dkt. 31, Exh. 3; MI Dep. at 127:19-128:2.  The Isaksons use the Tacoma

15  Property as their personal residence and have lived there continuously since 1977.  *Id*. at

16  128:7-8; Dkt. 31, Exh. 2, Joy Isakson Deposition ("JI Dep.") at 55:11-22.

17    On July 2, 1993, the Isaksons acquired a parcel of real property located at 4101

18  Lakeridge Drive E., Sumner, Washington (the "Lake Tapps" Property) via Quitclaim

19  Deed from Joy Isakson's father, Harold E. Fernald. Dkt. 31, Exh. 4; MI Dep. at 144:16-

20  25.  The Isaksons have continuously used the lakefront property for recreational

21  purposes.  JI Dep. at 37:19-23, 66:23-25, 70:3-7.

22

1    On October 17, 2006, the Isaksons created J&M. MI Dep. at 88:12-17, 89:21-24;

2  Dkt. 31, Exh. 5 ("Trust Agreement").  In 2007, the IRS issued the Isaksons an employee

3  identification number for J&M, and they opened a bank account for the foundation

4  thereafter.  MI Dep. at 88:12-17, 89:21-24.  Michael personally provided the money

5  required to open the bank account, which amounted to a few hundred dollars.  *Id*. at

6  87:22-88:6.

7    On September 29, 2007, the Isaksons transferred the Tacoma Property to J&M via

8  Quitclaim Deed.  Dkt. 31, Exh. 7. The Isaksons claim that they received ten dollars in

9  consideration for the property but admitted that no money actually changed hands.  *Id*.;

10  MI Dep. 133:17-18.  On the same day, the Isaksons also transferred the Lake Tapps

11  Property to J&M via Quitclaim Deed.  Dkt. 31, Exh. 8.  According to the deed, the

12  Isaksons received ten dollars in consideration for the property, but again no money

13  changed hands.  *Id*.; MI Dep. at 148:3–5.

14    On April 15, 2009, the Isaksons electronically filed a joint income tax return for

15  the 2008 tax year using what the government claims was a "fraudulent OID tax scheme."

16  Dkt. 31, Exh. 9; MI Dep. at 81:15-83:22.  On the form, the Isaksons listed their total

17  income as $671,229.00 and claimed $597,386.00 in withholdings.  Dkt. 31, Exh. 9.  The

18  government asserts that both of these numbers were false "in order to illegally obtain a

19  refund to which [the Isaksons] were not entitled."  Dkt. 31 at 10.  On April 24, 2009, the

20  Isaksons received a tax refund of $393,132.00, which was direct deposited in their joint

21  account.  Dkt. 31, Exh. 10.

22

1    Although the Tacoma Property had already been transferred to J&M, the Isaksons

2  used $81,500.00 of the refund money to pay off the mortgage on the Tacoma Property.

3  MI Dep. 85:23-86:7, 177:10-20; JI Dep. 107:6-24.  The Isaksons withdrew nearly

4  $200,000 in cashier's checks, which they then used to pay off credit cards and donate

5  money to their church.  MI Dep. 85:23-86:10, 177:24-178:19, JI Dep. 107:25-110:6.  The

6  remainder of the refund money is in cash in a safe at the Tacoma Property.  MI Dep.

7  86:11-22.

8    On May 24, 2010, a duly authorized delegate of the Secretary of the Treasury

9  made timely assessments against the Isakson for unpaid federal income taxes for the tax

10  year ending December 31, 2008, in the amount of $597,361.00 and interest in the amount

11  of $24,479.63.  Dkt. 31, Exh. 11.  Thereafter, the Isaksons received multiple letters from

12  the IRS informing them of their tax liabilities.

13    In August 2010, the Isaksons submitted a Form 1040X Amended U.S. Individual

14  Income Tax Return for the 2008 tax year.  Dkt. 31, Exh. 16.  On that filing, the Isaksons

15  stated that their originally reported adjusted gross income of $658,418 should be reduced

16  by $597,361 to $61,057.  *Id.*, Exh. 17.  The amended return also admitted that their

17  original reporting of federal income tax withholding of $597,361 should actually be $0.

18  *Id.*  In the explanation of changes, the Isaksons stated: "[T]his return corrects the prior

19  submittal per the recent Court decisions. The IRS never answered the 1099-OID

20  questions for the past three years."  *Id.*  At his deposition, Mr. Isakson admitted that he

21  filed the amended return, but could not explain the rationale set forth in the explanation

22  of changes.  MI Dep. 174:10-176:8.  The Isaksons further conceded that the original

ORDER - 4

1 | return was incorrect, and that the amended return reflects their correct income and

2 | liability for 2008.  MI Dep. 123:5-12; JI Dep. 91:10-16.

3 | On October 17, 2011, after receiving and processing the 2008 amended tax return,

4 | the IRS adjusted the tax assessments against the Isaksons accordingly.  Dkt. 31, Exh. 11.

5 | Further, on October 24, 2011, the IRS assessed a $5,000 penalty against Mr. Isakson

6 | under 26 U.S.C. § 6702 for filing the original frivolous return.  *Id*., Exh. 17.  The IRS has

7 | been able to collect small amounts of the unpaid taxes through forced collection, but a

8 | large balance persists.  Dkt. 31, Exh. 11.  On November 28, 2011 and November 26,

9 | 2012, the IRS assessed penalties against the Isaksons under 26 U.S.C. § 6651 for their

10 | failure to pay.  *Id*.  As of August 8, 2014, the total balance that the Isaksons owed the IRS

11 | was $498,896.30.   Dkt. 31, Exh. 18.

12 | On June 29, 2010, a delegate of the Secretary of the Treasury recorded in the

13 | County Auditor of Pierce County a Notice of Federal Tax Lien against "Michael R. &

14 | Joy L. Isakson" for the 2008 income tax year.  Dkt. 31, Exh. 7.  On May 11, 2011, a

15 | delegate of the Secretary of the Treasury recorded in the County Auditor of Pierce

16 | County a Notice of Federal Tax Lien identifying "J & M Charitable Foundation as

17 | nominee, alter ego, and/or transferee of Michael R. & Joy L. Isakson" and referencing the

18 | United States' tax lien for the 2008 year.  *Id*.

19 | After the Tacoma Property was transferred to J&M, the Isaksons' use of the

20 | Tacoma Property did not change in any meaningful way. The Isaksons continued to use

21 | the property as their residence and did not pay any rent to J&M.  MI Dep. at 134:17-23.

22 |

ORDER - 5

1  Prior to the transfer of the Tacoma Property to J&M, the Isaksons provided shelter, free

2  of charge, to various individuals with whom they were friendly.  JI Dep. 62:9-63:12.

3       Similarly, the Isaksons' use of the Lake Tapps Property did not change in any

4  meaningful way after it was transferred to J&M. Prior to the transfer, the Isaksons visited

5  the property to swim, and they invited families to swim and enjoy the property with them.

6  JI Dep. 37:19-23, 66:23-25.

7                    **III. DISCUSSION**

8  **A.      Summary Judgment Standard**

9       Summary judgment is proper only if the pleadings, the discovery and disclosure

10  materials on file, and any affidavits show that there is no genuine issue as to any material

11  fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

12  The moving party is entitled to judgment as a matter of law when the nonmoving party

13  fails to make a sufficient showing on an essential element of a claim in the case on which

14  the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

15  323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

16  could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

17  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

18  present specific, significant probative evidence, not simply "some metaphysical doubt").

19  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

20  if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

21  jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

22

1   U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

2   626, 630 (9th Cir. 1987).

3          The determination of the existence of a material fact is often a close question. The

4   Court must consider the substantive evidentiary burden that the nonmoving party must

5   meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

6   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

7   issues of controversy in favor of the nonmoving party only when the facts specifically

8   attested by that party contradict facts specifically attested by the moving party.  The

9   nonmoving party may not merely state that it will discredit the moving party's evidence

10  at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

11  *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

12  nonspecific statements in affidavits are not sufficient, and missing facts will not be

13  presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

14  **B.    Government's Motion**

15         When a taxpayer neglects or refuses to pay taxes, the IRS may, upon notice, levy

16  upon the delinquent taxpayer's property.  26 U.S.C. § 6331(a).

17         In this case, the only dispute is whether the government may levy upon the

18  properties that the Isaksons transferred to J&M.  On this issue, the government asserts

19  two theories under which it may levy upon the properties in question: (1) J&M is the alter

20  ego of the Isaksons and (2) the Isaksons fraudulently transferred the properties.  Dkt. 31

21  at 20-28.  With regard to the former, it is a borderline case whether material questions of

22  fact remain for trial.  Because the government is the moving party and has the burden of

1   proof at trial, its "*showing must be sufficient for the court to hold that no reasonable trier*

2   *of fact could find other than for the moving party.*"  *Calderone v. United States*, 799 F.2d

3   254, 259 (6th Cir. 1986) (citation omitted); *see also Southern Calif. Gas Co. v. City of*

4   *Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).  While the Isaksons' contentions that J&M

5   is not an alter ego are weak at best (Dkt. 32 at 10-14), the Court is unable to conclude that

6   no reasonable trier of fact would find in their favor.  Thus, the Court declines to

7   thoroughly address this issue because the other theory is dispositive.

8           With regard to the government's alternative theory, Washington has adopted the

9   Uniform Fraudulent Transfer Act.  RCW 19.40.041.  Under that statute, a transfer is

10  fraudulent if the transfer is made

11          Without receiving a reasonably equivalent value in exchange for the
            transfer or obligation, and the debtor:
12              (i) Was engaged or was about to engage in a business or a
            transaction for which the remaining assets of the debtor were unreasonably
13          small in relation to the business or transaction; or
                 (ii) Intended to incur, or believed or reasonably should have
14          believed that he or she would incur, debts beyond his or her ability to pay
            as they became due.
15
    *Id*.  The government argues that the facts establish a fraudulent transfer under this portion
16
    of the statute while the Isaksons argue that questions of fact exist.  While the Court
17
    agrees with the government that no reasonably equivalent value was exchanged, the
18
    Court finds that questions of fact exist on each of the other alternative elements.  Material
19
    questions of fact exist mainly because eighteen months passed between the transfer of the
20
    properties and the filing of the relevant tax return.  For example, a reasonable juror could
21
    conclude that, when the transfers were made, the Isaksons were neither engaged in nor
22

ORDER - 8

1   were about to engage in a business transaction that would sufficiently decrease their

2   remaining assets.  Similarly, whether they intended to incur or reasonably believed that

3   they would incur significant debt at the time of transfer is an open question of fact.  The

4   Isaksons attending a conference and/or obtaining some tax defiler information before or

5   around the time of the transfer definitely weighs in the governments' favor, but the Court

6   is unable to conclude as a matter of law that no reasonable juror could believe the

7   Isaksons' story.  Therefore, the Court denies the government's motion on this issue

8   because questions of fact remain for trial.

9                                   **IV. ORDER**

10          Therefore, it is hereby **ORDERED** that the government's motion for summary

11   judgment (Dkt. 31) is **DENIED**.

12          Dated this 4th day of November, 2015.

13

14                                                _____

                                                 BENJAMIN H. SETTLE

15                                               United States District Judge

16

17

18

19

20

21

22